# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| KRISTINA P. CAMPAGNA, | ) |
| | ) |
|         *Plaintiff* | ) |
| | ) |
| v. | )    No. 2:16-cv-00521-JDL |
| | ) |
| NANCY A. BERRYHILL, | ) |
| *Acting Commissioner of Social Security,* | ) |
| | ) |
|         *Defendant* | ) |

## *REPORT AND RECOMMENDED DECISION*[1]

This Social Security Disability ("SSD") and Supplemental Security Income ("SSI") appeal raises the question of whether the administrative law judge ("ALJ") supportably found the plaintiff capable of performing work existing in significant numbers in the national economy. The plaintiff seeks remand on the bases that the ALJ erred in evaluating (i) the medical opinions of record, (ii) the plaintiff's credibility, and (iii) the plaintiff's residual functional capacity ("RFC"). *See* Statement of Errors (ECF No. 11) at 2-8. I find no reversible error. Accordingly, I recommend that the court affirm the commissioner's decision.

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. §§ 404.1520, 416.920; *Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the ALJ found, in relevant part, that the plaintiff met the insured status requirements of the Social Security Act through June 30, 2017, Finding 1, Record at 14; that she had severe impairments of bipolar

---

[1] This action is properly brought under 42 U.S.C. §§ 405(g) and 1383(c)(3). The commissioner has admitted that the plaintiff has exhausted her administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2), which requires the plaintiff to file an itemized statement of the specific errors upon which she seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office, and the commissioner to file a written opposition to the itemized statement. Oral argument was held before me pursuant to Local Rule 16.3(a)(2)(D), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

1

disorder and alcohol dependence, Finding 3, *id*. at 15; that she had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: a limitation in concentration/persistence/pace with the ability to understand, carry out, and remember only simple tasks, and a limitation in social functioning requiring object-oriented tasks with only up to occasional interaction with the general public, Finding 5, *id*. at 17; that, considering her age (45 years old, defined as a younger individual, on her alleged amended disability onset date, June 1, 2013), education (at least high school), work experience (transferability of skills immaterial), and RFC, there were jobs existing in significant numbers in the national economy that she could perform, Findings 8-11, *id*. at 20; and that she, therefore, had not been disabled from June 1, 2013, through the date of the decision, September 25, 2015, Finding 12, *id*. at 21. The Appeals Council declined to review the decision, *id*. at 1-3, making the decision the final determination of the commissioner, 20 C.F.R. §§ 404.981, 416.1481; *Dupuis v. Sec'y of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).[2]

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The ALJ reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than her past

---

[2] The plaintiff initially alleged that she had been disabled since October 1, 2013, but amended her alleged onset date of disability to June 1, 2013. *See* Record at 12. The ALJ found that she had engaged in substantial gainful activity ("SGA") until October 1, 2013, as a result of which the only remaining issue was whether she had been disabled since October 2, 2013. *See id*. at 15. The plaintiff does not appeal that determination. *See* Statement of Errors at 1-2.

relevant work. 20 C.F.R. §§ 404.1520(g), 416.920(g); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Goodermote*, 690 F.2d at 7. The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work. *Rosado v. Sec'y of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

## I. Discussion

### A. The ALJ's Evaluation of Opinion Evidence

The plaintiff first alleges that the ALJ erred in her consideration of the medical opinions of record. *See* Statement of Errors at 2-5. The ALJ gave "substantial weight" to the opinions of two agency nonexamining consultants, Thomas Knox, Ph.D., and Brian Stahl, Ph.D., and "less probative weight" to the opinions of Sandra Corbett, M.D., the plaintiff's treating primary-care physician, Thor Agustsson, D.O., her treating psychiatrist, and Virginia Lawrence, N.P., her treating nurse practitioner ("NP"). *See* Record at 19. I find no reversible error.

### 1. The Plaintiff's Treating Sources

On May 27, 2014, Dr. Corbett completed a form titled "Medical statement concerning bipolar disorder with possible substance abuse for Social Security disability claim." *See id.* at 611-13. Therein, she opined, *inter alia*, that the plaintiff had marked limitations in her ability to understand and remember either short and simple or detailed instructions, maintain attention and concentration for extended periods, and interact appropriately with the general public. *See id.* at 612. She deemed the plaintiff extremely impaired in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *See id.*

NP Lawrence completed the same form on July 31, 2014. *See id.* at 735-37. Of the 20 categories listed under the heading "Work Limitations Related to Psychiatric State," she found the plaintiff to be markedly or extremely impaired in all but three. *See id.* at 736-37. She indicated,

3

for example, that the plaintiff was extremely impaired in her abilities to understand and remember short and simple instructions, carry out detailed instructions, and maintain attention and concentration for extended periods. *See id* at 736.

NP Lawrence attached a letter in which she stated that the plaintiff, who was diagnosed with bipolar I disorder, had been receiving mental health treatment at her clinic since February 2014. *See id.* at 734. She noted that the plaintiff's bouts of bipolar-related mania had led to her hospitalization in December 2013 and March 2014. *See id.* Finally, she commented that, although the plaintiff had "demonstrated significant improvement in her motivation to work with psychiatric providers to find the best strategy through psychotropic medications to manage this mood disorder" and had "shown commitment to substance abuse programs[,]" she was "not in a place of emotional or behavioral stability that would enable her to hold employment." *Id*. She explained:

> She continues to experience high anxiety and bouts of panic. She is vulnerable to emotional overwhelm in social/public situations and her ability to sustain attention and manage impulsivity is limited. She continues to be easily triggered and becomes distractible such that she is unable to be an effective employee.

*See id.* On June 30, 2015, Dr. Agustsson signed the bottom of NP Lawrence's form, effectively endorsing her opinion. *See id.* at 867-69.

The ALJ acknowledged that the opinions of treating sources generally are given more weight, even controlling weight, if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence. *See id*. at 19; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, she deemed the treating sources' opinions "inconsistent with other substantial evidence[,] including . . . relatively unremarkable mental status findings." *Id*. (citations omitted).

That "other substantial evidence[,]" which the ALJ had just discussed in the context of assessing the plaintiff's credibility, included not only findings on mental status examination but

4

also the plaintiff's activities of daily living and the contrary opinions of Drs. Knox and Stahl. *See id*. at 18-19. With respect to activities of daily living, the ALJ observed, in relevant part, that the plaintiff "ha[d] been somewhat noncompliant with her psychiatric treatment by not taking her prescribed medications properly while running out on multiple occasions." *Id*. at 19 (citations omitted).

The ALJ further noted, in explaining why she had given substantial weight to the Knox and Stahl opinions, that "the [plaintiff's] own treating psychiatric clinicians, particularly at the Maine Behavioral Health Center, have indicated GAF's [Global Assessment of Functioning scores] as high as '60', consistent with only moderate symptoms." *Id*. (citations omitted).[3] She stated that she gave less weight to treating sources' assessments of GAF scores between 24 and 50, which "obviously represent only short-term exacerbations in symptoms which improved in short periods of time." *Id*. at 19 n.6 (citations omitted).[4]

---

[3] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., text rev. 2000) ("DSM-IV-TR"). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id*. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 34. A GAF score of 51 to 60 represents "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *Id*. (boldface omitted). In 2013, the DSM-IV-TR was superseded by the American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-V"), which jettisoned the use of GAF scores. *See* DSM-V at 16 ("It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.").

[4] A GAF score of 21 to 30 represents "[b]ehavior [that] is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM-IV-TR at 34 (boldface omitted). A GAF score of 31 to 40 reflects "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id*. (boldface omitted). A GAF score of 41 to 50 represents "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*. (boldface omitted).

The thrust of the plaintiff's argument is that the ALJ erred in choosing to credit the opinions of two agency nonexamining consultants over those of three treating sources who concurred that her mental-health symptoms were disabling. *See* Statement of Errors at 2-3. Yet, it was the ALJ's job to resolve such conflicts. *See, e.g., Rodriguez,* 647 F.2d at 222 ("The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts."). An ALJ's choice to credit the opinions of agency nonexamining consultants over those of treating medical sources is not, in itself, error. *See, e.g., Brown v. Astrue*, No. 2:10-cv-27-DBH, 2010 WL 5261004, at *3 (D. Me. Dec. 16, 2010) (rec. dec., *aff'd* Jan. 4, 2011).

Nor was the ALJ obliged to give the plaintiff's treating sources' opinions controlling weight on the record before her. As a matter of law, the opinion of NP Lawrence was not entitled to controlling weight because a nurse practitioner is not a so-called "acceptable medical source." 20 C.F.R. §§ 404.1513(a), 416.913(a) (nurse practitioners not listed among those deemed acceptable medical sources); Social Security Ruling 06-03p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2017) ("SSR 06-03p"), at 327 ("[O]nly 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight.") (citations omitted). The opinions of Drs. Corbett and Agustsson were entitled to controlling weight only if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the plaintiff's] case record[.]" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). As the plaintiff acknowledges, *see* Statement of Errors at 3, the ALJ found otherwise, *see* Record at 19, and, for the reasons discussed below, the plaintiff does not succeed in demonstrating that this conclusion was unsupported by substantial evidence.

Because the ALJ did not give the opinions of Drs. Corbett and Agustsson controlling weight, she was required only to supply "good reasons" for the weight she afforded them based on consideration of relevant factors.[5] *See, e.g., Heath v. Astrue*, No. 1:12-cv-99-DBH, 2012 WL 6913440, at *11 (D. Me. Dec. 30, 2012) (rec. dec., *aff'd* Jan. 18, 2013) ("[O]nce the [ALJ] determined that the opinion [of a treating source] was not entitled to controlling weight, he had discretion to reject it, provided that he supplied good reasons for so doing.") (citations and internal quotation marks omitted). The commissioner correctly observes that lack of support and inconsistency with other substantial evidence of record are well-recognized bases for affording a treating source's medical opinion little or no weight. *See* Defendant's Opposition to Plaintiff's Itemized Statement of Errors ("Opposition") (ECF No. 16), at 4-5; *Bailey v. Colvin*, No. 2:13-cv-57-GZS, 2014 WL 334480, at *3 (D. Me. Jan. 29, 2014) (ALJ's assignment of little weight to treating physician's opinion passed muster when based, *inter alia*, on inconsistency between treatment notes and treating physician's conclusions and fact that opinion appeared to be based primarily on the claimant's subjective allegations).

With respect to the opinion of NP Lawrence, the controlling standard differed: the ALJ was obliged simply to "explain the weight given" to the Lawrence opinion "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning[.]" SSR 06-03p at 331.

Because, as I explain below, the ALJ provided good reasons for rejecting the opinions of all three treating sources, she necessarily met the lower standard to provide an explanation of the weight given to the opinion of NP Lawrence.

---

[5] Those factors are (i) treatment relationship, including length of the treatment relationship, frequency of examination, and nature and extent of the treatment relationship, (ii) supportability – *i.e.*, adequacy of explanation for the opinion, (iii) consistency with the record as a whole, (iv) specialization – *i.e.*, whether the opinion relates to the source's specialty, and (v) other factors highlighted by the claimant. *See* 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

7

In her statement of errors, the plaintiff takes issue with two of the bases on which the ALJ assigned the opinions of her treating sources little weight: GAF scores and medication noncompliance. *See* Statement of Errors at 4-5.

On the first point, the plaintiff contends that the ALJ placed an undue emphasis on GAF scores in the 60s, representing moderate symptoms, when she was consistently found to have GAF scores in the 50s, representing serious symptoms. *See id*. at 4. She adds that, consistent with her bipolar disorder, her GAF scores deteriorated to 24 on three occasions: in December 2013, when she reported that she had a plan to shoot herself, and in February and March 2014, after her boyfriend broke a promise to take her to Cancun. *See id*. She asserts that, while NP Lawrence did assess her with a GAF score of 60 on February 25, 2015, after she had received "positive feedback" while spending a month and a half with her family in California, she reported a psychotic break on June 3, 2015, following her increased use of alcohol to self-medicate her anxiety, and, by June 30, 2015, was assessed with a GAF score of 50. *See id*. She notes that her GAF score thereafter remained at that level or lower. *See id*.

The commissioner rejoins that the ALJ properly characterized the plaintiff's GAF scores in the 24 to 40 range as corresponding with brief hospitalizations. *See* Opposition at 6. She concedes that the ALJ erred in discounting GAF scores of 50 on the same basis given the frequency with which that score was assessed. *See id*. However, she contends that any error was harmless for several reasons. *See id*. at 6-8. I agree.

*First*, even assuming *arguendo* that the ALJ should not have relied on the plaintiff's GAF scores of 50 to demonstrate the treating source opinions' inconsistency with, and/or lack of support in, the record, she identified other substantial evidence supporting that finding in the form of the plaintiff's largely normal mental status examinations. *See* Record at 19. The plaintiff does not

8

challenge the ALJ's characterization of, or reliance on, those results. *See* Statement of Errors at 2-5; *see also, e.g., LeBlanc v. Colvin*, No. 2:13-cv-348-JDL, 2014 WL 5431567, at *4 (D. Me. Oct. 24, 2014) (ALJ's omission to note GAF scores of 50 and 55 not harmful when longitudinal evidence otherwise supported ALJ's conclusion that claimant's mental impairments nonsevere).

*Second*, "[a] GAF score, standing alone, does not necessarily indicate an inability to work or to perform specific work-related functions." *LaFontaine v. Astrue*, No. 1:10-cv-527-JAW, 2011 WL 4459197, at *4 (D. Me. Sept. 25, 2011) (rec. dec., *aff'd* Oct. 13, 2011). As this court has noted:

> [A]ccording to the DSM's explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational function. A 41-50 reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning.

*Id.* (citation and internal quotation marks omitted) (emphasis in original). *See also, e.g.*, *Sheldon v. Colvin*, Civil No. 2:13-CV-315-DBH, 2014 WL 3533376, at *8 (D. Me. July 15, 2014) (because GAF scores "can be based on behaviors that have little or no relationship to occupational functioning," ALJ properly discounted importance of such scores when, in her view, claimant's "relatively normal activities of daily living and other evidence revealed an ability to do what he chose to do").

*Third*, the ALJ relied heavily on the opinions of Drs. Knox and Stahl, both of whom reviewed records reflecting the plaintiff's psychiatric hospitalizations. *See* Record at 81, 106-07. Dr. Knox also reviewed records showing GAF scores of 50 subsequent to the plaintiff's 2014 hospitalizations. *See id*. at 106-07. While he did not see subsequent records reflecting the same GAF score, those records were cumulative. *See Johnson v. Colvin*, No. 1:13-cv-00297-JDL, 2014 WL 4181606, at *4 (D. Me. Aug. 21, 2014) (opinions of agency nonexamining consultants could stand as substantial evidence of nonseverity of claimant's mental impairments when, although they

9

did not see later records containing a GAF score of 35, the score was cumulative of GAF scores they had seen).

For all of these reasons, the ALJ's error in discounting the plaintiff's GAF scores of 50 on an erroneous basis made no outcome-determinative difference, rending it harmless.

On the second point, the plaintiff takes issue with the ALJ's discussion of her noncompliance with her medication, arguing:

> [The ALJ] did not address whether or not this is a common symptom of bipolar syndrome, and there is no evidence to suggest that the facts that she relied on to find non-compliance are inconsistent with severe manic and depressed mood swings. If you review [the plaintiff's] medication regimen, it is apparent her condition has deteriorated and her medications have, by necessity, been frequently changed, and usually increased.

Statement of Errors at 4-5.

The commissioner acknowledges that an ALJ should not rely on a claimant's noncompliance with treatment without considering any explanation the claimant may offer. *See* Opposition at 12; Social Security Ruling 96-7p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2017) ("SSR 96-7p"), at 139 ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

However, as the commissioner observes, *see* Opposition at 12, the plaintiff points to no evidence that she provided any explanation to the ALJ for her medication noncompliance or that it was attributable to her bipolar disorder, *see* Statement of Errors at 4-5; *McNelley v. Colvin*, No. 15-1871, 2016 WL 2941714, at *3 (1st Cir. Apr. 28, 2016) (claimant's attempt to attribute his

10

discontinuance of therapy to his mental impairment was unavailing when his treating physician had not done so).

The plaintiff, accordingly, fails to demonstrate that the ALJ erred in considering her medication noncompliance inconsistent with the opinion of her treating sources that she had a number of marked and extreme limitations in her ability to perform work-related mental demands.[6]

## 2. Agency Nonexamining Consultants

The plaintiff also challenges the ALJ's reliance on the opinions of the two agency nonexamining consultants in this case, Drs. Knox and Stahl. *See* Statement of Errors at 2. This argument, too, is unavailing.

In an opinion dated April 2, 2014, approximately six months after the plaintiff's then-alleged disability onset date of October 1, 2013, Dr. Stahl determined that her "[c]ondition is currently severe but has not met the duration requirement." Record at 82; 20 C.F.R. §§ 404.1509, 416.909 ("Unless your impairment is expected to result in death, it must have lasted or be expected to last for a continuous period of at least 12 months. We call this the duration requirement."). He added that he expected that, by September 30, 2014, the plaintiff's "condition will not meet or equal a listing but be severe[,]" noting that he had projected a mental RFC for her as of that date. Record at 82. He explained that, in his opinions, the plaintiff's medically determinable impairment(s) "is not, or will not be, or was not, of such severity so as to prevent, or to have prevented, [her] from engaging in SGA within twelve months after onset." *Id*. at 83.

---

[6] The plaintiff also takes issue with the ALJ's reference to Dr. Agustsson as "simply" an osteopath, "even though he is a qualified psychiatrist." Statement of Errors at 3; Record at 19. Dr. Agustsson is, in fact, an osteopath by training, *see e.g.* Record at 866, and, thus, the ALJ's description as such was not inaccurate. The plaintiff fails to point to a specific way in which the ALJ erroneously discounted Dr. Agustsson's opinion in any way because of this, and the objection is accordingly overruled. *See* Statement of Errors at 3.

11

In an opinion dated September 9, 2014, Dr. Knox deemed the plaintiff's bipolar condition severe but found that it did not meet or equal a listing. *See id*. at 108. He concurred with Dr. Stahl's projected mental RFC, finding that the plaintiff was able to work in two-hour blocks performing simple (not complex) tasks over the course of a normal workday/workweek, could interact appropriately with coworkers and supervisors but not with the public, and was able to adapt to simple changes. *Compare id*. at 110-11 *with id*. at 84-85.

The plaintiff faults the ALJ's reliance on the Stahl opinion on the basis that Dr. Stahl wrongly concluded that her disability would not last a full year and did not have the benefit of review of any of her treating providers' opinions. *See* Statement of Errors at 2. She faults the ALJ's reliance on the Knox opinion on the ground that Dr. Knox, as well, did not have the benefit of review of the treating source opinions. *See id*. at 2-3.

As the commissioner points out, *see* Opposition at 8, Dr. Stahl did not conclude that the plaintiff would have been disabled but for her failure to meet the duration requirement. Rather, he projected that she would have a mental RFC at the end of the one-year duration period consistent with that which the ALJ ultimately assessed. *Compare* Record at 84-85 *with* Finding 6, *id*. at 17. In any event, as the commissioner notes, *see* Opposition at 9, the ALJ did not predicate her decision on failure to meet the duration requirement, *see* Record at 16-19.

While Dr. Stahl did not have the benefit of review of the Corbett, Lawrence, or Agustsson opinions, *see id*. at 83, Dr. Knox reviewed both the Corbett and Lawrence opinions, *see id*. at 109, and the ALJ ultimately gave greater weight to the Knox than the Stahl opinion on the basis that Dr. Knox "had a more complete and updated record for [his] review[,]" *id*. at 16 n.3, 19 n.5

(citations omitted).⁷ As the commissioner observes, *see* Opposition at 9, Dr. Agustsson merely endorsed NP Lawrence's opinion, *see* Record at 867-69, and the plaintiff has not argued that her condition changed materially following Dr. Agustsson's review, *see* Statement of Errors at 2-3; *see also, e.g.*, *Gagnon v. Colvin*, No. 2:13-cv-00213-NT, 2014 WL 3530629, at *5 (D. Me. July 15, 2014) ("An [ALJ] may rely on the opinions of state-agency reviewers when he or she finds that no new clinical evidence has been provided that would contradict the findings of those reviewers[.]") (citation and internal quotation marks omitted.

Remand, accordingly, is not warranted on the basis of this point of error.

### B. The ALJ's Credibility Finding

The plaintiff next complains that the ALJ erred in assessing the plaintiff's credibility. *See* Statement of Errors at 5-7. For the reasons explained below, she fails to demonstrate that remand is warranted on the basis of this point of error.⁸

The ALJ found that, although the plaintiff's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms[,]" her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible for the reasons explained in this decision." Record at 18.

In addition to discussing the plaintiff's GAF scores, largely normal mental status examinations, and pattern of noncompliance with her medication regimen, the ALJ stated:

---

⁷ Dr. Knox explicitly addressed both the Lawrence and Corbett opinions, explaining that he had reduced the weight given to the Lawrence opinion because NP Lawrence was not an acceptable medical source and apparently had not been trained in Social Security rules and procedures, and he had reduced the weight given to both the Lawrence and Corbett opinions on the basis that they were not consistent with the overall medical evidence of record. *See* Record at 111-12.

⁸ To the extent that the plaintiff contended at oral argument that the ALJ also erred evaluating the testimony of her former employee, Misty Keeffe, *see* Record at 65-71, she waived the issue by failing to include it in her statement of errors, *see, e.g.*, *Farrin v. Barnhart*, No. 05-144-P-H, 2006 WL 549376, at *5 (D. Me. March 6, 2006) (rec. dec., *aff'd* March 28, 2006) ("Counsel for the . . . Social Security bar generally are hereby placed on notice that in the future, issues or claims not raised in the itemized statement of errors required by this court's Local Rule 16.3(a) will be considered waived and will not be addressed by this court.") (footnote omitted).

13

> In terms of her alleged severe symptoms and disabling limitations, the [plaintiff's] extensive daily activities, including working at her yoga studio (at the SGA level and having prepared her own taxes for the business), obtaining liposuction, attending school, going to Cancun and Las Vegas, visiting family in California and traveling "by myself" during the alleged period of disability[,] [are] clearly inconsistent with these disabling allegations.

*Id.* at 19.

An ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p at 136. The plaintiff complains that the ALJ did not comply with this standard. *See* Statement of Errors at 5-7. I disagree.

The plaintiff faults the ALJ's credibility determination on the bases that the ALJ (i) ignored her long and consistent work history when evaluating her credibility and (ii) erred in relying on the listed daily activities, almost every one of which had ended by the time of her amended alleged onset date of disability or was misconstrued by the ALJ. *See id*.

She contends that, in ignoring her work history, the ALJ violated 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) as well as SSR 96-7p. *See id.* She cites *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983), and *Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3d Cir. 1981), for the proposition that a claimant's testimony is entitled to substantial weight when she has a good work history. *See id*. These arguments are unavailing.

While the cited regulations and ruling promise consideration of the evidence presented, including information about a claimant's "prior work record," they do not require that an ALJ discuss that evidence or accord any particular weight to it. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p at 136. As the commissioner observes, *see* Opposition at 13, the

14

plaintiff cites no caselaw from this circuit holding that an ALJ must accord greater weight to the allegations of a claimant with a strong work history, and this court has rejected that very proposition, *see Preston v. Colvin*, Civil No. 2:13-CV-321-DBH, 2014 WL 5410290, at *7 (D. Me. Oct. 21, 2014) ("A claimant is not entitled to a presumption of credibility based on a long work history.").

As concerns activities of daily living, the plaintiff argues, *inter alia*, that the ALJ failed to take into account that her medication noncompliance was consistent with her disease process, *see* Statement of Errors at 6-7 – a point that is unavailing for the reasons discussed above. She adds that:

1. "[S]he clearly did not work at her yoga business nor fill out her taxes subsequent to her yoga business going down the drain (no taxes were filed for 2014)." *Id*. at 6. "She testified that she filled out her taxes until then, but when asked if she knew how to fill them out, she admitted she had no memory [and] did not know how to correctly fill out a business tax return." *Id.* (citation omitted).

2. "The records are replete with evidence that she was unable to successfully attend school, despite her best efforts." *Id*.

3. Her trip to Cancun caused "a severe aggravation" of her bipolar condition, resulting in hospitalization, and "other trips were paid for by her family, and were primarily intended to provide her with needed support." *Id*. For example, her aunt accompanied her when she went for therapy on August 21, 2014, and her family paid for her to spend time with them over the 2014-15 holidays, where she received support that allowed her to maintain a GAF score of 60 for four months. *See id*. However, that improvement ended in large part due to her inability to function at school. *See id*.

As the commissioner notes, *see* Opposition at 10, an ALJ may take into account an individual's activities in evaluating the credibility of her allegations, *see, e.g., Nolan v. Astrue*, Civil No. 09-323-P-H, 2010 WL 2605699, at *7 n.4 (D. Me. June 24, 2010) (rec. dec., *aff'd* July 28, 2010). She persuasively argues that the ALJ reasonably relied on the above-cited activities in that:

1. There is some evidence that the plaintiff worked at her yoga studio after her alleged onset date of disability, *see* Opposition at 10-11; Record at 60-63, 605, 609, 876, and, while no taxes were filed for 2014, the plaintiff admitted to preparing her own taxes for 2013, which would have been due in 2014, *see* Opposition at 11; Record at 64-65.

2. While there is evidence that the plaintiff experienced frustrations at the community college that she attended and received varying support from her instructors, *see* Opposition at 11; Record at 764, 767, 836, she testified during her hearing that she had completed all four of her courses the previous spring and got along with other students, *see* Opposition at 11; Record at 42-44.

3. While, as counsel for the commissioner admitted at oral argument, the ALJ should not have relied on the February 2014 Cancun trip, which led to the plaintiff's hospitalization for an overdose and a possible suicide attempt, the plaintiff resumed sobriety, and her condition improved in the following months. *See* Opposition at 11; Record at 528-37, 779-80. The plaintiff did travel independently to Las Vegas and California in early 2015. *See* Opposition at 11-12; Record at 46-48, 764.

### C. The ALJ'S RFC Assessment

Finally, the plaintiff argues, in a three-sentence section of her brief, that the ALJ erred in formulating her RFC by failing to meet the standards of Social Security Ruling 96-8p ("SSR 96-8p"), *see* Statement of Errors at 7, specifically, the following directives:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

SSR 96-8p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2017), at 148.

However, as the commissioner notes, the plaintiff "has not identified any particular evidence the ALJ failed to consider, much less demonstrated that explicit consideration of such evidence would have changed the outcome." Opposition at 15; *see also* Statement of Errors at 7. I agree, and the plaintiff's argument, accordingly, is waived. *See, e.g., Reynolds v. Astrue*, No. 07-5-B-W, 2007 WL 3023573, at *7 (D. Me. Oct. 12, 2007) (rec. dec., *aff'd* Oct. 30, 2007) ("In this court, issues asserted in conclusory fashion without developed argumentation will be considered waived.").

### II. Conclusion

For the foregoing reasons, I recommend that the commissioner's decision be **AFFIRMED**.

17

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 3rd day of November, 2017.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge